

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-002-CR

ROGER EUGENE FAIN A/K/A                                        APPELLANT
ROGER EUGENE FAIN, JR.

V.

THE STATE OF TEXAS                                                  STATE

------------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

A jury convicted Appellant Roger Eugene Fain a/k/a Roger Eugene Fain,
Jr. of capital murder, and the trial court sentenced him to imprisonment for life.
Appellant brings four points on appeal, challenging the legal and factual
sufficiency of the evidence and evidentiary rulings and arguing jury charge error.

---

[1] *See* Tex. R. App. P. 47.4.

Because the trial court committed no reversible error, we affirm the trial court's judgment.

### Sufficiency of the Evidence

In his first point, Appellant challenges both the legal and factual sufficiency of the evidence to support his conviction for capital murder. He argues that the evidence is both legally and factually insufficient to show (1) that he killed Linda Donahew, the deceased, (2) that her death was caused intentionally, and (3) that her death occurred in the course of committing or attempting to commit the offense of aggravated sexual assault. Although he raises his complaints of legal and factual sufficiency in a single point, the Texas Court of Criminal Appeals instructs us that we should address them separately.[2]

The jury heard the following evidence. Bonnie Bishop shared a house with her sister, Donahew. On June 1, 1987, Bishop left work and arrived home at approximately 8:00 p.m. She entered the house to find her sister's nude and blood-covered body lying on the floor in a bedroom closet.

The autopsy revealed that Donahew had died from manual strangulation and that a secondary cause of death was a stab wound to her neck. The postmortem examination also revealed several hairs found clinched in her

---

[2] *Laster v. State*, 275 S.W.3d 512, 519 (Tex. Crim. App. 2009).

hands, DNA artifacts in her mouth, and three foreign pubic hairs in the genital area.

Approximately fourteen years later, in August 2001, a DNA sample was taken from Appellant, who was incarcerated for an unrelated crime. The sample was entered into the Combined DNA Index System (CODIS) of the Texas Department of Public Safety (DPS). Four years later, in October 2005, the cold case of Donahew's murder was reopened, and the DNA samples acquired during the examination of her body were uploaded into CODIS and were found to match the DNA profile of Appellant.

There was no direct evidence of Appellant's involvement in Donahew's murder. At trial, the State relied on the DNA evidence, testimony from a witness who saw a truck similar to that owned by Appellant at the time of the offense parked in front of Donahew's house at the time of the offense, the testimony of an inmate, Danny Smith, who claimed that Appellant had confessed to him in jail, testimony that Donahew had previously been seen in the company of Appellant, and testimony that on the day of her death she had said that she was worried about meeting someone who wanted to look at a truck she was selling.

Dr. Nizam Peerwani, the medical examiner who performed the autopsy and forensic examination of Donahew's body, testified that he took oral swabs

3

from her mouth and that they contained DNA material. He testified that he was unable to determine exactly when the DNA had been deposited in her mouth. Kelly Solis testified that she was a DNA analyst for the DPS CODIS lab in Austin, Texas. She testified that the DNA samples from the oral swabs taken by Dr. Peerwani matched Appellant's DNA profile.

Constance Patton testified that she was a senior forensic biologist and DNA technical leader for the medical examiner's office crime laboratory in Fort Worth. She testified that she had examined the samples from the oral swabs taken by Dr. Peerwani and that the results of her examination showed that the samples contained DNA material consistent with the DNA of Donahew and a mixture containing one DNA sample consistent with that of Appellant and a sample of male DNA foreign to both Donahew and Appellant. Patton testified that it could not be determined whether Appellant's DNA had been contributed before or after the other male DNA or how long it had been present. She also testified that she had tested a portion of a towel taken from Donahew's house. The towel tested presumptively for blood and also for a mixture of DNA from Donahew. She testified that a sample of male DNA from Ronald Nix, a boyfriend of Donahew, could not be excluded from matching the sample on the towel. Patton also found a sperm stain on the comforter from Donahew's bed, the DNA profile of which also matched Nix's sample.

4

Dr. Peerwani had found several hairs clutched in Donahew's hand during the postmortem examination. One of the hairs was identified as dog hair. Other hairs were consistent with either the hair of Donahew or that of her sister, Bishop. One hair, however, was not matched to Donahew, Bishop, or Appellant.

Susan Kenney testified that in 1987 she had been working as a serologist in the Fort Worth Police Department Crime Lab. She examined the evidence taken by Dr. Peerwani as part of the examination of Donahew's body. She testified that part of the protocol of the examination was to comb the pubic hair area of Donahew. In this case, the combing resulted in finding three hairs that were not similar to those of Donahew.

Detective Jim Ford testified that he had requested DNA testing of the unknown pubic hair found on Donahew's body. The test showed that Nix could not be eliminated as a contributor of the hair.

Luke Kortegast, who testified by videotaped deposition because he was on active duty in the military and scheduled to be deployed overseas, testified that at the time of the offense, when he was seventeen years old, he lived with his parents next door to Donahew, whom he described as attractive. He often saw a white pickup truck parked at Donahew's house from the winter of 1986 through the early spring of 1987. He described the truck as a mid-to-late

5

1970s white pickup truck with large tires and a raised suspension. He thought that it was a four-wheel drive truck and in "pretty good shape." He testified that on occasion the truck had been at the house overnight. He did not remember the trucks having a toolbox or a PVC pipe attached to its bed.

He described the driver as a white male, approximately six feet tall and weighing between 175 and 200 pounds, with long dark brown hair and a beard that ranged from a few days' stubble to a full beard. Kortegast testified that the man usually wore a baseball cap and aviator-type sunglasses.

At some point in the spring, Kortegast stopped seeing the truck at Donahew's house, but he testified that he did see it parked in the driveway one more time on the day of Donahew's murder. He testified that the truck was in the driveway at approximately 10:30 a.m. the day of her death. He was unable to identify Appellant as the driver of the truck, either at trial or from a photo spread. Kortegast also testified that Donahew had frequent visitors in addition to the bearded man.

Ernest Fain, Appellant's brother, testified that in 1987, Appellant drove a mid-1970s white Ford pickup truck and that the truck had a black tool box and PVC piping attached to its bed. He described it as a standard truck, not a raised four-wheel-drive vehicle. He also testified that he had seen Appellant approximately a dozen times during 1986 and 1987 and that he had never

6

known Appellant to have a beard. He also testified that the pickup was "very beat up."

Sheila Nelson testified that she lived next door to Donahew in 1987. On the day of Donahew's murder, Nelson and her husband left the house at approximately 5:15 p.m. to take a walk. They noticed a white Ford pickup truck parked on the street "not in front of my house and not in front of Linda's but kind of in between the two." She testified that it was an older model truck with a tool box. The truck was still there when she returned from her walk about fifteen to twenty minutes later. She and her husband went out to eat, and when they returned at about 8:30 p.m., the pickup was gone. Nelson testified that Donahew had had a lot of friends and quite a bit of company.

Bishop, Donahew's sister, testified that in November 2005 she had been shown a photo spread containing Appellant's photograph. After looking at it for approximately twenty minutes, she had told Detective Ford that she did not recognize anyone in it. After the photo array was shown to her other sister, however, Bishop asked to see it again, and she then told Ford that it looked like someone who had come up to Donahew in a restaurant and bar called John B's. Bishop also testified that Donahew had broken up with Nix some time before her death.

7

Donald Thweatt testified that in 1987 he owned two horses, which he stabled at Braddock's Stables in Arlington. Around June 1, 1987, he saw Donahew, who also kept horses there, at the stables. She was not driving her usual vehicle but was with a male in a 1970s white Ford pickup. He described the man as being about six feet tall and weighing around 180 pounds with shoulder-length hair and glasses. On cross examination, Thweatt said that Donahew and the man were unloading clear plastic bags of cedar shavings. He also described the man as having an untrimmed and unkempt beard. Thweatt testified that he could not remember the exact date, but that it was "sometime in the late spring of 1987."

Michael Higham testified that in the late spring and summer of 1987, he was the detail shop manager of Pleasant Ridge Car Wash in Arlington. In the late spring or early summer of 1987, Donahew took her car in for detailing. When he had finished with the car, he went to the horse stables to pick her up and take her back to her car. She was with a man whom he identified as Appellant. Higham drove both the man and Donahew back to pick up her car.

Arlington police officer William Zimmerman testified that in August 1987, he had interviewed Michael Higham and that Higham had told him that on the day he went to pick up Donahew at the stables, she was not there when he arrived. Higham had talked to Ms. Braddock for a few minutes until Donahew

8

arrived with a white male who was driving a pale blue 1973 or 1974 pickup truck with wide spoked wheels.

Danny Smith, a sixty-three-year-old inmate who at the time of trial was serving forty-five years' confinement for involuntary manslaughter, enhanced to a habitual offense, testified that he knew Appellant from having been in prison with him. In 2005, while they were housed in the same cell block of the Eastham Unit, Appellant told him that Arlington detectives had visited him and had taken mouth swabs for DNA purposes. After the visit, Appellant started "acting in an excited type of manner." Appellant told Smith that he had been having sex with Donahew and had unintentionally strangled her during sex. Smith claimed that Appellant told him that the strangulation was part of the sex act.

Smith admitted that he was worried about the possibility of dying in prison and that he had lost various appeals in his case, up to and including his appeals in federal court and the United States Supreme Court. He also admitted that he had made contact with the Tarrant County District Attorney's office regarding testifying against Appellant, calling himself a "crucial State's witness" and offering his testimony in exchange for benefits to him, including help with his sentence. He testified that he had wanted a guarantee in writing of help "in this and possibly other offenses currently unsolved." He also

admitted to having offered himself as a State's witness in other cases. In exchange, he had asked to be removed from his current prison unit and placed in a unit with better medical facilities. He also admitted that he had, in fact, been moved to a geriatric medical facility in the Terrell Unit.

Smith testified that when he was interviewed by Appellant's trial counsel, he had told them that he did not know why he had been brought to Tarrant County and that he did not have any information that would help the State regarding Appellant's alleged killing of Donahew. Smith also denied knowing that one of Appellant's attorneys was, in fact, an attorney. Later, however, Smith admitted that he had previously written to the same attorney requesting help in his case. Smith testified that Appellant had shared news articles from newspapers and from the internet about the Donahew murder case.

Ronald Nix testified that he had dated Donahew from February 1987 until her death. In May 1987, he and Donahew had taken a vacation together to Mexico. A picture taken at the time of the trip showed that in May 1987, Nix had dark, curly hair and wore a full beard. He also testified that he had seen Donahew on the Friday preceding her death. He testified that shortly before her death, he had been at a club with Donahew and had seen her talking with a man whom Nix identified as Appellant. Nix testified that Donahew had given

Appellant her phone number.  Nix also admitted that he had been at Braddock Stables with Donahew in May 1987.

To recap, Danny Smith testified that Appellant had admitted strangling Donahew, albeit during consensual sexual activity.  The medical examiner's evidence showed that stabbing was a secondary cause of death.  The jury was free to believe or disbelieve Appellant's description of the sexual activity as consensual, and the fact that Donahew was stabbed was some evidence that the sexual activity was not consensual.  Corroborating evidence includes the evidence that Appellant's DNA was found in Donahew's mouth, Nix's testimony that he had seen Donahew talking to Appellant in a bar, and Nelson's testimony that a truck similar to Appellant's had been parked on the street near Donahew's house after 5:00 p.m. on the day of her death.  This evidence tends to connect Appellant to Donahew's murder.  Applying the appropriate standard of review and viewing the evidence in the light most favorable to the prosecution,[3] we hold that a rational trier of fact could have found the essential elements of capital murder in the course of committing aggravated sexual assault beyond a reasonable doubt.

---

[3] *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

11

In determining the factual sufficiency of the evidence, we recognize that most of the evidence is equivocal. Appellant's DNA was found in Donahew's mouth, but unidentified DNA was also present in her mouth, and Nix's DNA was found in a semen stain on the bed's comforter and on a towel. There is no way to know when the DNA samples were deposited or the order in which they were deposited. Nix's hair, but not Appellant's, was found in a combing of Donahew's pubic hair. Additionally, Nix's testimony that he was dating Donahew at the time of her death was disputed by her sister's testimony that Donahew had broken up with Nix. A photograph of Nix from May 1987 showed that he had a beard, and there was testimony that Appellant had never worn a beard. A neighbor saw a man with a beard visiting Donahew's house regularly and testified that the man drove a white pickup that was in good shape, unlike the testimony regarding Appellant's pickup. The neighbor testified that there was a period of time when the man did not come to Donahew's house but that the pickup was in the driveway around 10:30 the morning she was killed.

Although there was testimony that Donahew had been with a man at Braddock Stables in late spring or early summer, Nix admitted that he had been at the stables with her in May 1987. Officer Zimmerman testified that Michael Higham had told him that Donahew had arrived in a pickup with a man.

12

Higham testified that he saw Donahew and a man unloading clear plastic bags of cedar shavings. The witnesses could have been testifying about two different men or two different occurrences with the same man.

Smith's testimony was corroborated by the evidence of the presence of a pickup similar to the description of Appellant's pickup outside Donahew's house on the evening she was killed and the presence of Appellant's DNA in her mouth. The jury apparently believed that Appellant had confessed to Smith but did not believe that Appellant had engaged in consensual sexual activity with consensual autoerotic strangulation.[4] The fact that Donahew was also fatally stabbed is evidence that undermines Appellant's claim of consent. "The jury, as the exclusive judge of the credibility of the witnesses and the weight to be given their testimony, may accept all, part or none of the testimony of any one witness in determining the facts proved."[5] Because stabbing was a secondary cause of death, and Donahew was alive when she was stabbed, according to the medical examiner's testimony, the strangulation and stabbing occurred in close temporal proximity. It was reasonable for the jury to believe that Appellant had told Smith that he had strangled Donahew and to believe that Appellant was truthful about the strangulation, but also reasonable for the jury

---

[4] *See Johnson v. State*, 23 S.W.3d 1, 8, 9 (Tex. Crim. App. 2000).

[5] *Johnson v. State*, 503 S.W.2d 788, 793 (Tex. Crim. App. 1974).

13

to disbelieve Appellant's claim that the sexual activity and the strangulation were consensual. And it was reasonable for the jury to conclude, based on the medical examiner's testimony, that Appellant had also stabbed Donahew. Applying the appropriate standard of review,[6] we therefore hold that the evidence is factually sufficient to support the jury's verdict. We overrule Appellant's first point.

## Seizure of DNA Sample

In his second point, Appellant argues that the trial court committed reversible error by denying his challenge to the taking of a DNA sample from his body.

In August 2001, a DNA sample was taken by swabbing Appellant's mouth. It was taken in compliance with a general provision requiring routine collection of DNA samples from individuals who had been convicted of certain offenses.[7] When the sample was entered into DPS's CODIS, it became available for comparison with the DNA evidence acquired when Donahew's

---

[6] *See Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson v. State*, 204 S.W.3d 404, 414–15, 417 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 8, 9, 12.

[7] *See* Act effective Sept. 1, 1999, 76th Leg., R.S., ch. 1368, 1999 Tex. Gen. Laws 4626, 4626–27 (current version at Tex. Gov't Code Ann. § 411.148 (Vernon Supp. 2008)).

14

body was examined.  When those samples taken from Donahew were uploaded into CODIS, they showed a match with Appellant's DNA profile.

The trial court denied Appellant's motion to suppress the DNA evidence. Although the DNA sample at trial was taken pursuant to a warrant, dated December 5, 2005, the warrant was obtained based on the CODIS match, which had been based on the initial 2001 DNA sample obtained from Appellant without a warrant but pursuant to the government code provision.  The Texas Court of Criminal Appeals has addressed this issue and has decided it contrary to Appellant's argument:

> Although the taking of a blood sample for DNA analysis purposes is clearly a search, the Fourth Amendment does not proscribe all searches, only those that are unreasonable.  The United States Supreme Court has yet to address the validity of state and federal DNA collection statutes under the Fourth Amendment, but state and federal courts that have addressed the issue of a warrantless search for DNA databank samples pursuant to statute are almost unanimous in holding that these statutes do not violate the Fourth Amendment.
>
> The courts deciding this issue have split in their rationale. Some have stated that DNA collection statutes permit a warrantless, suspicionless search under the Supreme Court's "special needs" test.  Most federal and state courts, however, have upheld the DNA databank statutes under the "totality of circumstances" test.   This trend increased after the Supreme Court's decision in *Samson v. California*, which used the "totality of the circumstances" test to uphold suspicionless searches of felons on parole, as long as the searches are not arbitrary, capricious, or harassing.  Even before *Samson*, numerous courts had applied the "totality of the circumstances" test and concluded

15

that the governmental interest served by collecting DNA outweighed the minimal intrusion upon a probationer's or parolee's privacy. We agree with those jurisdictions that have held that warrantless DNA collection and databank systems pass Fourth Amendment scrutiny under the "totality of the circumstances."[8]

Following the mandatory precedent of the Texas Court of Criminal Appeals, we overrule Appellant's second point.

### Mistake of Fact

In his third point, Appellant argues that the trial court reversibly erred by failing to include a mistake of fact jury instruction in the jury charge. Section 8.02 of the penal code provides that it is a defense to prosecution that "the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense."[9] A defendant is entitled to an instruction on mistake of fact if the issue is raised by the evidence.[10] If the evidence when viewed in the light favorable to the defendant does not establish a mistake of fact defense, the instruction is not required.[11]

---

[8] *Segundo v. State*, 270 S.W.3d 79, 97–98 (Tex. Crim. App. 2008) (citations omitted).

[9] Tex. Penal Code Ann. § 8.02(a) (Vernon 2003).

[10] *Beggs v. State*, 597 S.W.2d 375, 380 (Tex. Crim. App. 1980).

[11] *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999).

16

The indictment charges that Appellant intentionally caused the death of Linda Donahew by strangling her with his hand or hands, or with an object unknown to the grand jury, by stabbing her with a knife, or by any combination of strangling and stabbing her with a knife, and that Appellant was in the course of committing or attempting to commit the offense of aggravated sexual assault when he caused her death. Smith testified that Appellant told him that he had been having sex with Donahew and had unintentionally strangled her during sex and that the strangulation was part of the sex act. The trial court refused to instruct the jury regarding a mistake of fact on Appellant's part regarding the degree of the compression of Donahew's neck. To the extent that the manual strangulation was the cause of death, Smith's testimony raises the issue of mistake of fact. Accordingly, the trial court should have given the mistake of fact instruction and erred by not doing so.

Error in the charge, if, as here, properly preserved in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error.[12] In other words, a properly preserved error will require

---

[12] Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 2006); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Minor v. State*, 91 S.W.3d 824, 827–29 (Tex. App.—Fort Worth 2002, pet. ref'd)

17

reversal as long as the error is not harmless.[13] Whether Appellant suffered any harm "must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole."[14]

The jury was instructed that a person commits aggravated sexual assault if he "intentionally or knowingly causes the penetration of the mouth of another person, who is not the spouse of the actor, by the sexual organ of the actor, without that person's consent, and if the person causes serious bodily injury or attempts to cause the death of the victim." The trial court also instructed the jury that serious bodily injury means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

The jury charge, then, implicitly instructed the jury that if Appellant caused Donahew's death in the course of committing sexual assault, he had committed aggravated sexual assault, and the jury charge explicitly instructed

_____

(applying analysis).

[13] *Almanza*, 686 S.W.2d at 171.

[14] *Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

18

the jury that if Appellant caused her death during the commission of aggravated sexual assault, he had committed capital murder. That is, the jury was implicitly instructed that the act that converted sexual assault into aggravated sexual assault could be the same act that converted this offense into capital murder.

Although the capital murder statute provides that a person who causes the death of another individual in the course of committing kidnapping or robbery commits the offense of capital murder, this statute does not allow for the conviction of a person for capital murder if the person committed simple sexual assault rather than aggravated sexual assault.[15] That is, a person may commit simple kidnapping or robbery, without an aggravating element, and if the person causes death during the commission of one of those offenses, the person commits capital murder.[16] But in regard to sexual assault, a person is guilty of capital murder only if the person causes the death in the course of committing aggravated, not simple, sexual assault.[17] Neither the State nor Appellant suggests that the aggravated sexual assault was proved by evidence of the attempt to cause the death, which in this case was successful. Can the

---

[15] Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2008).

[16] *Id.*

[17] *Id.*

attempt to cause the death be carved out as a separate aggravating factor from the successful act of causing the death? Appellant did not raise this issue as part of his sufficiency claim; we bring it up only in addressing harm.

The medical evidence establishes that Donahew was both strangled and stabbed. There is no evidence of a threat that would elevate the sexual assault to an aggravated sexual assault.[18] Although both means of causing the death were submitted to the jury, there is no evidence that the stabbing was accidental or the result of a mistake of fact. Additionally, the evidence shows that Donahew was stabbed while she was still alive. It was the stab wound, not the strangulation, that the medical examiner testified was delivered to "really make sure [she was] going to die." Although the medical examiner described the cause of death as "manual strangulation and the second cause of death was a stab wound to the left neck," the stab wound was delivered to a living person.

Both the indictment and the jury charge allowed the jury to convict Appellant of capital murder if the jury found that Appellant had caused Donahew's death by stabbing her with a knife in the course of committing aggravated sexual assault. "When a general verdict is returned and the

_____

[18] *See id.* § 22.021(a)(1), (2)(A)(ii)–(iii).

20

evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted, the verdict will be upheld."[19]

The record before this court would allow the jury to view the strangling as the threat of death or serious bodily injury in the course of sexual assault to raise sexual assault to an aggravated offense.[20] The jury therefore could have found that the stab wound caused the death in the course of Appellant's committing aggravated sexual assault.

The State was obligated to prove that Appellant intentionally caused Donahew's death. Failure to include the requested instruction on mistake of fact would at first glance seem to necessitate a determination that Appellant suffered some harm as a result of that failure. But here, Donahew was not only strangled; she was also stabbed, as the medical examiner phrased it, to make sure that she was really dead. It was therefore unnecessary for the jury to find that Appellant intended to strangle her to death in order for the jury to find that he intentionally caused her death by stabbing her in the neck. Mistake of fact went only to the strangling, not to the stabbing.

---

[19] *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App.), *cert. denied*, 522 U.S. 844 (1997).

[20] Tex. Penal Code Ann. § 22.021(a)(1), (2)(A).

Because of the presence of the stab wound, we conclude that Appellant did not suffer any harm from the trial court's refusal to give the mistake of fact instruction regarding the degree of compression of Donahew's neck. Accordingly, we overrule Appellant's third point.

## Rule 803(3) Statement

In his fourth point, Appellant argues that the trial court reversibly erred by admitting a statement by Donahew that she was going to show her pickup to a man who might be interested in purchasing it. Appellant argues that he was entitled to confront and cross examine the witness about the statement and that its admission constituted inadmissible hearsay and a denial of his rights under the Confrontation Clause of the Sixth Amendment.

Linda Reed testified that Donahew was a close friend and had come to her house for a visit around 11:00 a.m. on the day she died. Donahew left around 3:00 p.m. that afternoon, and as she left, she told Reed that she was nervous because later she was going to show her pickup truck to a man she had met at the stables and that he might buy it from her. Reed testified that Donahew had a bad feeling about the meeting.

The State argues that the statement was not testimonial and therefore not subject to a *Crawford* analysis.[21]  We agree.  The Sixth Amendment Confrontation Clause forbids the admission of testimonial statements of a witness who does not appear at trial unless that person was unable to testify and the defendant had a prior opportunity for cross examination.[22]  The Supreme Court suggests that testimonial statements are those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[23]  The State argues that such casual remarks made to friends are generally not testimonial.  Under the limited facts of this case, we agree that Donahew's statement to Reed was not testimonial but, rather, a casual remark expressing her intent to go show her truck.  The statement about being nervous is an indication of her state of mind.  There is no indication that Donahew made her remark to Reed under circumstances that would have led an objective witness to believe that the statement would be available for use at a trial later.  Because the statement was not testimonial, it does not violate the Confrontation Clause.

---

[21] *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004).

[22] *Vinson v. State*, 252 S.W.3d 336, 338 (Tex. Crim. App. 2008) (citing *Crawford*, 541 U.S. at 53–54, 124 S. Ct. at 1365).

[23] *See Crawford*, 541 U.S. at 51–52, 124 S. Ct. at 1364.

Regarding Appellant's contention that the statement is inadmissible hearsay, the State argues that under the *Hillmon* doctrine,[24] a remark is admissible as a hearsay exception under rule 803(3) if it constitutes a statement of present state of mind offered to prove subsequent conduct in accordance with the state of mind.  We disagree with the State's analysis but not its ultimate conclusion that the statement was admissible.  Donahew's statement was not admissible to show that she did indeed go to show her truck.  It was not admissible for the truth of the matter asserted but rather to show her intent, her state of mind.[25]  We overrule Appellant's fourth point.

### Conclusion

Having overruled Appellant's four points, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 20, 2009

---

[24] *Mut. Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285, 12 S. Ct. 909 (1892).

[25] *See* Tex. R. Evid. 803(3).

24